The Honorable, the Judges, a United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, please be seated. All right, we have our first case is Clinchfield Coal v. DOWCP. Ms. Prince, I'm happy to hear from you. May it please the Court, Kendra Prince for the petitioner, Clinchfield Coal Company. Your Honors, this case turns on whether the administrative law judges' findings of total disability were rational, supported by substantial evidence, and in accordance with the law. Clinchfield here today asserts they were not. Here, the ALJ has failed to weigh the contrary probative evidence as required by the Administrative Procedures Act and the case law. The Benefits Review Board here has compounded those issues by affirming the ALJ's findings without adequate, meaningful review. Now the ALJ here has relied on two pulmonary function tests. One dated October 29, 2014, and the other February 23, 2018, to find the claimant was totally disabled. Now the arguments for these are slightly different, so I'd like to address one in turn. Turning to the October 2014 PFT, I think it's important to note that this PFT was done in connection with the Department of Labor examination and thus is subject to the quality oversights. Section 718.103c specifically mandates that no results shall constitute evidence of pulmonary impairment unless it meets the standards set forth in Appendix B. Appendix B further provides that maximum effort is required. It specifically lists out a litany of things required, but specifically that seven seconds of exhalation or until an obvious plateau is reached. Counsel, doesn't Appendix B often also say that if it's established that one or more of the standards have not been met, the claims adjuster may consider such fact in determining the evidentiary weight to be given to the results of the function test? Isn't that also part of Appendix B? It is part of the Appendix B, Your Honor, but we have experts in this case who are saying that given the inadequacies in this PFT, that it is unreliable and it does not meet those quality standards listed in Appendix B. So how are we supposed to read the language of 718.101, the substantial compliance language and the evidentiary weight language in Appendix B under your theory of the case? It seems to me you're reading both of those phrases out of the relevant regulatory language. Your Honor, employer would assert that Section 718.103C, specifically referring to the pulmonary function test is what would be controlling here and 718.103C specifically mandates, it provides that no results can constitute evidence of pulmonary impairment unless it meets the standard set forth in Appendix B and employer would assert that. And then the sentence that you just read continues to say, in accordance with the requirements of this section and Appendix B, and this section meaning 718, Section 718, right? Yes, Your Honor. And Section 718 speaks about substantial compliance and Appendix B speaks about evidentiary weight. Yes, Your Honor. And so how are we not reading those phrases out of the regulatory language if we follow your analysis? What's the meaning of those phrases under your theory of the regulation? Your Honor, essentially to be in substantial compliance it needs to comply with the regulation with Appendix B and to be in substantial compliance meaning that most of those need to be met or there needs to be an explanation for why one is immaterial to the pulmonary function test. Where's your explanation requirement in the regulation? Is there a requirement that there be an explanation? No, Your Honor. There is a presumption that the PFT is in compliance, but when there is contrary probative evidence, an expert must review, excuse me, the ALJ must review that contrary probative evidence and determine if the PFT in effect is valid and reliable. And substantial compliance is a part of that evaluation, isn't it, by the statute? The metric is a lot, not a lot more, but it's more elastic than what you concede, right? Yes, Your Honor. But the case law in the APA still requires the ALJ to explain those findings and to weigh that contrary probative evidence. The six seconds plus a half or a nanosecond is pretty close to compliance with seven seconds, isn't it? It might be pretty close, but it still doesn't meet the... It's substantial, isn't it? If you did it from a mathematical standpoint, it's got to be high 90s, high 90s, isn't it? It may be, but... It is. It doesn't... It still doesn't reach that specific standard. It's still... Being in substantial compliance means that an employer's assertion that while one of those... While they might not reach a seven seconds of exhalation, it might meet other standards listed. So you're equating strict and substantial compliance to be the same. You're saying that strict compliance is the same thing, it's substantial, because the other way, I don't see any delta that you're conceding between those two. It wouldn't be a strict compliance, but it would be a compliance... So you concede it's not strict, right? Yes, Your Honor. Okay. But it would be a compliance with various of the things listed out in Appendix B. While a claimant may not have seven seconds of exhalation, they could meet other standards listed and be in substantial compliance. And isn't that what happened here? That the other requirements were met other than the number of seconds? There were the number of seconds for exhalation, but all three of the experts, or four of the experts that reviewed... There's three experts that reviewed one PFT and three experts that reviewed the other PFT. All of those experts said that it was not just the seven seconds of exhalation. It's the fact that the claimant didn't achieve maximum effort, that he didn't breathe in the full amount of air and breathe out the full amount of air as required when they're administering these PFTs. And the reason that that is important is that when you administer this PFT, you have to have the full expiration and inspiration so that we can understand what the claimant's current impairment is. And that's why these policies... Is effort the sole criterion of the validity of a PFT? Say that again, Your Honor. Is effort the sole criterion for evaluation of the validity of the PFT? Effort is not the sole criteria, Your Honor. There are other litany of criteria listed, and that these pulmonary experts take into consideration when they determine whether a pulmonary function test is a reliable indicator of pulmonary impairment. What concerns me is that you're trying to split the findings so fine and talking about complete compliance versus substantial compliance. And I wonder if we're not stripping the interim presumption of its effect. Normally the interim presumption, and in this case this individual has worked a long number of years in the mines, and I haven't sat on many cases where the interim presumption was validly invoked, but the benefit of it was overturned on a question where different experts reached different conclusions as to the validity of the PFT. And if these circumstances, if we were to reverse here, I wonder if we wouldn't be denying the interim presumption of the beneficial effect that the miner is entitled to. And the interim presumption is critical to the whole Black, Alone Act proof scheme. And in order to overturn it, I would expect to see something fairly conclusive among the different physicians who had evaluated, the different experts who had evaluated the PFT. And I don't see that here. Your Honor, while the 15-year interim presumption does apply, it's still the claimant's burden to prove he is totally disabled and to invoke the 15-year presumption that he has pneumoconiosis and it contributed to that disability. But importantly, the case law still requires ALJ to review the contrary probative evidence and explain his reasoning for weighing or not weighing the evidence. Simply here, we don't know why the ALJ discredited Dr. Wren or Dr. Sargent or Dr. Fino or Dr. Rosenberg. We know that the ALJ did credit Dr. Jaripu in regards to the 2014 PFT. Well, I saw Dr. Fino actually thought the October 2014 test was good and was valid, and yet he was representing or he generally comes down on the side of the company here and even here he thought the test was valid. Your Honor, I believe Dr. Fino did not find the test invalid, but he said it was a better effort than what he saw with his own testing. He still didn't ultimately find the test itself to be valid is my understanding of Dr. Fino's opinion. Your understanding, my understanding was a little bit different. I thought he felt the test to be a good test and a valid test. But importantly, we still don't know how the ALJ weighed Dr. Fino's opinion in regards to this PFT. We don't know because the ALJ didn't explain why Dr. Fino was entitled to weigh or not entitled to weigh or how he weighed Dr. Fino's opinion against or with Dr. Jaripu and Dr. Renavia. You know, the case law still requires at a bare minimum that the ALJ weigh that contrary probative evidence. Your Honors, we reviewed the Southern Ohio case that you all, this court had sent us, and we're asking for the same standard that that ALJ put forth. In that Southern Ohio case, we have an expert saying that this PFT is invalid because the claimant did not or was suffering from an acute illness. And then we have the DOL expert saying, oh, this PFT is valid. And then we have an ALJ going into the record and saying, well, this expert is discredited for these reasons and provided reasons from the record for why that expert would not be entitled to any weight. We're asking the court in this case to do the same thing, to require the ALJ to explain why these experts are entitled to no weight. As I recall, the ALJ explicitly considered the miners' effort and cooperation in connection with the PFTs and thought they were sufficient. I mean, but I did think that, as I recall, if I misread the record, then that's my problem. But as I recall it, the ALJ did explicitly consider the miners' effort and cooperation. The ALJ did discuss the miners' effort and cooperation, but the ALJ didn't discuss how he weighed Dr. Sargent, Dr. Fino, and Dr. Wren's opinion against Dr. Ajarapu's opinion and Dr. Renabadi's opinion. I think that JA53 is exactly what you're describing. All of the reports are addressed by the ALJ, and this just seems to me a classic battle of the experts. I actually have an unrelated question, if I may. The regulations provide four methods for establishing disability. One of those is the PFT, and then there are three others, including the fourth, which is a physician exercising reasonable medical judgment that a respiratory or pulmonary condition prohibits the claimant from engaging in employment. So it strikes me that the fourth is separate and apart from the PFTs, and therefore the ALJ could consider the physician's reasonable medical judgment that the claimant was no longer able to work, was completely disabled, based on all of the things that the physician here considered, including an examination and diagnosis. And so the PFTs, which you argue are invalid, were but one consideration, but the regulations allow the physician exercising reasonable judgment to make a determination separate and apart from the PFTs standing on their own, does it not? That is correct, but the ALJ still must explain how, even if the PFTs were not taken into consideration and that expert opinion is not based on the PFTs, the ALJ must still explain why and how this expert is entitled to wait, given inadequacies in the PFT evidence that they ultimately relied on in making that opinion. So it essentially sours their opinion if the PFT evidence is in fact invalid, then the ALJ must explain why their opinion otherwise is entitled to wait. Well, as I say, I thought the ALJ did discuss effort and cooperation, but what I'm concerned about is that we are losing the forest for the trees here because, as Judge Berner points out, the effort and cooperation is but one factor in the PFT, and the PFT is but one factor in the overall assessment of pneumoconiosis, and the interim presumption has to weigh in at some point, and so by focusing on this one little thing, I wonder if we are not departing from the proof scheme in the way that Congress has set forth. Congress wanted people that had worked in the mines a substantial period of time to recover benefits, and that would be particularly true in the case where the experts are not conclusive, and as Judge Berner points out, it really was a battle of the experts, and to overturn it here just seems to me we're overlooking what Congress was getting at. That's the problem I'm having. May I answer, Your Honor? Yes, of course. Congress did implement the presumption to ensure that miners who worked 15 years in the coal mine industry could more easily receive benefits. However, the regulation still put in place that it was the claimant's burden, it's the miner's burden, to prove that they are totally disabled, and a part of that proving total disability includes this multifactual test of ABGs, pulmonary function tests, and medical opinions, and parsing those out is part of the claimant's burden, Your Honor. I just want to respond to you. You just said and. The regulation actually says or, right? Yes, Your Honor. I apologize. Or. Well, it could be any of those things. There are four methods of establishing disability, so PFTs is just one method. That is correct. But a physician exercising reasonable medical judgment is a different method. That is correct, Your Honor. Can I make one brief conclusionary statement? Thank you. You have some rebuttal time. Oh, yes. I'll do it then. Thank you. Ms. Wolfe, we're happy to hear from you. Thank you. Good morning, Your Honors, and may it please the Court. My name is Rachel Wolfe, and I represent the respondent in this claim, Mr. Vernon Vanderpool. A claimant submits to this Court that the Board properly upheld the ALJ's decision of finding of disability because it's supported by substantial evidence, rationale, and in accordance with law. The ALJ properly applied the quality standards in Part 718 of the regulations in Appendix B in determining that the 102914 pulmonary function test was valid and supports the finding of total disability. My friend, Ms. Prince, has just suggested that we don't know how the ALJ ruled. I mean, how the ALJ did not provide a rationale of discrediting Dr. Fino's opinion. The ALJ took over four pages to discuss the 102914 pulmonary function test. This Court has held in Island Creek vs. Island Creek Coal Company vs. Blankenship that the duty of explanation is satisfied if the reviewing court can discern what the ALJ did and why the ALJ did it. I think it's important to note, and I think Judge Gregory, you made a good point. The framers noted that it's a substantial compliance requirement in Part 718. It's not an absolute compliance. It's not a total compliance. The judge weighed the evidence. Additionally, Appendix B notes that if one or more of the criteria of Appendix B are not met, the judge has the discretion to determine the weight to go to such tests, and that is what the judge did here on the 102914 pulmonary function test. The framers of the regulations are giving the fact finder a lot of discretion to make that determination for non-conforming tests. The employer might not agree with how the ALJ weighed the evidence, but the ALJ probably found that the validation opinions of Drs. Rand, Sargent, and Fino were not well-documented or well-reasoned and that the 102914 PFT was valid. Considering the Southern Ohio Coal Company case as persuasive evidence, that opinion said that the fact finder is allowed to make validation opinions that are and determine whether those opinions are well-reasoned and well-documented. If you look at Dr. Sargent's opinion with regard to the 102914, the ALJ properly found that it was not well-documented or well-reasoned. The ALJ, in fact, Dr. Sargent's opinion was equivocal and vague. One of the things that concerns me, if we were to remand this case, what good would it do? The ALJ would say something like, as I have said before, I credit Dr. Jarappu's opinions over Dr. Fino and Sargent. The ALJ would discuss why, as it's already done. I don't see where a remand, I assume you agree, I don't see what a good remand is going to do. I do agree, Judge Wilkinson. I think the judge thoroughly explained his decisions. He explained he considered all contrary evidence. He considered the opinions of Drs. Wren, Fino, and Sargent with regard to the 102914 pulmonary function test. He considered Dr. Jarappu's opinion, Dr. Jarappu's supplemental opinion, the validation study by Dr. Ranavea, the technician's comments on the pulmonary function test about cooperation and effort. I'll also point to Subsection 2G of Appendix B. It states that minors with a rapid decline in lung function or minors with obstructive lung disease are not likely to meet the reproducibility values of the FEV1 values within a 5% variance. In this PFT, the 102914, Mr. Vanderpool did meet the reproducibility values on the FEV1 values. He exhaled for over 6 seconds. Dr. Jarappu explained that in her supplemental opinion, which is one of the many reasons that the ALJ gave this pulmonary function test weight. In the section you just read, it specifies that failure to meet the standards should be clearly noted in the test report by the physician conducting or reviewing the test. Was the failure to meet the standard clearly noted? It was noted in Dr. Jarappu's supplemental opinion, yes, Your Honor. The bottom line is that fact-finding matters. Yes, Your Honor. Claimant would submit that the fact-finding matters. With regard to the 22318 pulmonary function test, claimant submits that the ALJ properly found that the 22318 was valid and supported finding a disability. This PFT did not have to be in compliance with Appendix B or 718103. It was taken in the course of claimant's treatment. The ALJ, again, how did he get to his decision and did he explain that? The ALJ did explain the 22318 pulmonary function test. He noted that the claimant had good cooperation and effort according to the technician's notes. He noted that the American Thoracic Society reciprocity criteria was met and the pre-criteria was met. He noted that the test said it was confirmed. It was faxed to the claimant's family physician, meaning, and I believe that shows that the ALJ properly inferred, which he's allowed to do, he's allowed to make inferences from the evidence, although he can't substitute his opinion, that it was a reliable test that could be used in the course of his treatment. When I was looking at the opinion, I said, ALJ sounds like he did a pretty good job. I believe so, Your Honor, and we also agree that the ALJ properly found that the medical opinion evidence based on Dr. Jarappu's 102914 pulmonary function test supported his finding a disability. We would ask that the decision by the board be upheld. I will take any more questions if the court has any. Thank you, Judge Gregory. Thank you. We have no more questions. Ms. Wolfe? Yes, Your Honor. Do you have some rebuttal time? I'm sorry, Ms. Prince. You're fine. Excuse me. Your Honor, this is not just who the ALJ chose out of competing experts. It's the fact that we don't know how the ALJ weighed the experts. And while, yes, the ALJ did discuss all of these expert opinions, we still don't know why he discredited these opinions. And that is the crux of the issue. And like in Milburn-Collery v. the Hicks case, where the ALJ cited no reason to discredit Dr. Rasmussen's opinion over Dr. Zaldivar, that's what we have here. We have no reason why Dr. Rinn's opinion was discredited. The ALJ discusses Dr. Rinn's opinion and the ALJ discusses Dr. Fino and Dr. Sargent and Dr. Rosenberg's opinions, but we don't know why the ALJ did not believe them. And as part of the ALJ's requirement is to explain those findings. The ALJ also seems to cite a board case called Laird v. Freeman v. United Coal in coming to these instances that, well, Dr. Ajerupu said, quote, this is what the claimant could do, and I give Dr. Ajerupu weight. And that's within the ALJ's discretion. He can give Dr. Ajerupu weight, but he still must explain why the other experts are entitled to no weight. And if they are entitled to weigh, the ALJ must then take those opinions and weigh them against the contrary probative evidence. And I'd also like to discuss the later 2018 treatment record PFT. While it is not subject to the quality standards, here the ALJ has also mischaracterized the record, essentially. The ALJ seems to put importance that this was a confirmed report, but if you look at the actual report, who it was confirmed by, there is a question mark. Additionally, the ALJ seems to imply that Dr. Ajerupu formed some type of opinion on this test. However, the absolute maximum that the record can support is that Dr. Ajerupu ordered this as part of the claimant's treatment. It was signed by Ann Davis, and beside her name says CRT. Otherwise, the machine-printed comments note good effort or met. That is the maximum amount on the PFT. There is no treatment record in this record where Dr. Ajerupu formed some type of opinion regarding validity. Additionally, in regards to those machine-printed comments, earlier in this decision, the ALJ reviewed something similar where the machine-printed comments noted it was a good effort. And the ALJ correctly determined that that was entitled to no weight because there is no understanding of what the machine meant by saying it met or was good effort. So, the ALJ seems to also imply that Dr. Ajerupu faxed this report to Dr. Brockhurst, the claimant's primary care physician, but there is no indication, again, in the record that is supported that Dr. Ajerupu either instructed or is the one to fax the report. The ALJ makes a substantial amount of inferences regarding this PFT, but still doesn't weigh that contrary probative evidence against the PFT in which she ultimately relied. There's three other experts in the record. He does discuss those opinions, but he doesn't explain why they are entitled to no weight regarding the reliability of this PFT. It's not enough that the ALJ relies on one expert to find that the PFTs are reliable and should be given weight. The ALJ must still weigh that opinion against the contrary probative evidence and must determine what weight to be given to the contrary probative evidence. Let me ask you a question. This is certainly not to be a trick question at all because if it's out of your knowledge, let me know, but so much has been said about the PFT. Basically, it's, someone says, empty all of the air out of your lungs, right? That is correct, your honor. Right, and the longer you can go, the better you are, or the better the test results, perhaps, right? Perhaps? Is that right? You were just supposed to expel all of the air out of your lungs. My question is, expelling all of your air, what does that do to the veracity of the test results? That's important, isn't it? What does it do to the veracity of the test results, the longer you exhale? If you don't know, I mean, that's fine. I'm not a medical expert, your honor, but what I will say is, from my understanding, is that it ensures that the test reflects the claimant's true maximum ability to be able to determine how much impairment there is. Exactly, and that's what my good friend and colleague, Dr. Wilkinson, was saying to you. That is, in terms of, your people said that there was no evidence, it was good effort, no malingering in those things, Mr. Van De Poel, and therefore, the effort was verified by the contract physicians you're talking about, so, and they noted that. The fact that, if they had said, you know, yeah, that 6.3, it's malingering, but he said that's the best effort. So, as the pneumoconiosis progresses, couldn't you have a reduced amount of seconds you have to exhale and you couldn't exhale for that long? Otherwise, you're so sick that you couldn't get to a four, but does that mean that you don't have communicable, is that, that's what I'm saying? In other words, as it progresses, I guess you might go, that's all I can do. So, the question is, malingering is important in your contract. People said there's no malingering, so, I mean, that's what I'm saying. How do you connect those two? In regards to effort, your honor, while exhalation is a main part, the other thing is the flow volume loops, and that's how experts determine, based on those flow volume loops, whether the claimant achieved his maximum effort in the PFT. So, even if the claimant isn't able to do absolutely everything they could, as long as the flow volume loops show, you know, adequate effort, then that's how an expert determines validity. And they do that by a malingering, they make a clinical finding of malingering if they think it's not. Yes, your honor. And here, in your contract, people said there was no malingering, and it was a good effort. That's what they said. Dr. Wrenn. Your physician, am I wrong about that? They said, it's noted that it was acknowledged as a good effort, no malingering. Dr. Wrenn listed a litany of issues with that pulmonary function test, and did not find it valid or reliable in finding the claimant disabled, your honor. Two of your doctors didn't say that? I don't believe so. I believe Dr. What the ALJ says is that two of your experts said that the problems could be related to other conditions such as heart disease, muscle weakness, or obesity. In other words, that there could be other reasons, I guess, that the claimant was unable to comply completely with the requirements of the exam. What strikes me as odd is that if somebody's so sick that they can't exhale for seven seconds, it seems like proof of disability if they're unable to exhale for seven seconds. And over and over again, the inability to exhale for seven seconds seems to show disability. Your honor, even claimants who are very, very sick are still able to achieve valid pulmonary function tests. They're just really low values. You know, one of the troubles that I have is with all these different layers of litigation, where we go from the ALJ to the Benefits Review Board, and then up here. And it takes years, sometimes, for these individuals to recover the benefits that they're due. And in the meantime, their disability gets worse. In many instances, they die. In other instances, if they die, their spouse has to wait an exceedingly long time before getting the benefits. In other words, this is a long, drawn-out process in which people who have really suffered respiratory and pulmonary disease through prolonged exposure to the dust that emanates from coal mines. And to add to the years and years it takes them to recover, a remand that elongates this process even further, seems to me at some point we have to take account of the old axiom, that justice delayed is justice denied. Your honor, I would like to point out that this claim would be covered by the trust fund, so the claimant is currently receiving benefits in that interim litigation period. Thank you. Thank you, your honors. Judge Gregory, you have five minutes. Thank you, your honors. Thank you. We'll come down and recounsel and move to the next case.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Nicole G. Berner